AMY JANE LONGO, Cal. Bar No. 198304
E-mail: LongoA@sec.gov
MATTHEW T. MONTGOMERY, Cal. Bar No. 260149
E-mail: MontgomeryM@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine B. Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 South Flower Street, Suite 900
Los Angeles, California 90071-9591
Telephone: (323) 965-3998
Facsimile: (213) 443-1905

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | **Case No.** |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| DIVERSE FINANCIAL CORPORATION, ROY DEKEL, and DAVID KANDELL, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "SEC") alleges as follows:

## <u>JURISDICTION AND VENUE</u>

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), and 78aa.

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails, in connection with the

transactions, acts, practices and courses of business alleged in this Complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because all defendants reside in this district.

## SUMMARY

4.     This action involves an offering fraud committed by the three defendants:  (1) Diverse Financial Corporation ("Diverse Financial"), a now-insolvent financial services company, through its bankrupt subsidiary DF Capital Partners, LLC ("DF Capital"); (2) Roy Dekel ("Dekel"), Diverse Financial's chairman, chief executive officer and 45% owner; and (3) David Kandell ("Kandell"), former president of Diverse Financial and its 45% owner.  (Dekel, Kandell and Diverse Financial are collectively referred to herein as "Defendants").

5.     Through promissory notes issued by DF Capital (the "Notes"), Defendants raised at least $3.29 million from at least 16 U.S. investors over a two-and a half year period, falsely claiming they would use investor proceeds exclusively to invest in premium finance lending or "short term cash type investments" pending such investment, when in fact, they misappropriated investors' money to fund Diverse Financial's and its affiliates' operations.

6.     Diverse Financial operated at a loss for 2011 and 2012, the first two years the DF Capital Notes were offered, as well as in 2013, when Diverse Financial could continue operating only because of the infusions of diverted DF Capital investor funds.  Defendants looted the proceeds of the DF Capital Notes to sustain the operations of Diverse Financial and its affiliates and to make Ponzi-like payments to certain investors.  Defendants misappropriated 100% of the more than $3 million invested in DF Capital, before filing for bankruptcy in February 2015,

leaving Diverse Financial with $0 in its coffers and three of its other subsidiaries also in bankruptcy.  In August 2015, Dekel himself also filed for bankruptcy.

7.     To solicit investors' participation in their fraudulent offering, Defendants gave investors a term sheet, an investment overview, and a note purchase agreement.  These offering materials stated that DF Capital would loan the investor proceeds to a premium finance lender ("PFL"), which, in turn, would lend money to insureds so they could pay their life insurance premiums.

8.     Defendants told investors that they would use the Notes proceeds to make multiple short term loans to PFLs, generating a profit based on the volume of premium finance lending conducted.  Provided that the PFLs repaid the loans, the investors' principal would be available either to make additional loans or to repay investors.

9.     Contrary to what Defendants represented, investors' funds were not exclusively invested with PFLs or in short term cash type investments.  Rather, Diverse Financial and Dekel diverted DF Capital investors' funds to the bank account of Diverse Financial.  Diverse Financial and Dekel used the DF Capital Notes proceeds to fund Diverse Financial's and its affiliates' operations, such as paying Dekel's, Kandell's and others' salaries, credit card bills, marketing costs, and unrelated attorneys fees.  Diverse Financial and Dekel also made Ponzi-like payments to certain investors.

10.     In offering and selling these securities to U.S. investors, Defendants, acting with scienter, or at a minimum with negligence, made material misrepresentations and omissions as to the uses of investors' monies, while misappropriating investor funds.  By this conduct, Defendants Diverse Financial and Dekel have violated and are violating the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, and Defendant Kandell has violated and is violating the antifraud provisions of Section 17(a)(2) of the Securities Act,

15 U.S.C. § 77q(2).

11.     The SEC seeks disgorgement of Defendants' ill-gotten gains, prejudgment interest, and civil penalties.

## THE DEFENDANTS

12.     **Diverse Financial Corporation** ("Diverse Financial") is a California corporation formed on July 16, 2007.  Its principal place of business is a virtual office located at 8105 Irvine Center Drive, Irvine, California 92618.  Diverse Financial is not registered with the SEC in any capacity.  Diverse Financial purports to provide financial services including insurance, investment and retirement planning.  It owns and is the managing member of DF Capital Partners, LLC.

13.     **Roy Dekel** ("Dekel") resides in Mission Viejo, California and is the Chief Executive Officer and Chairman of Diverse Financial.  Dekel is not registered with the SEC in any capacity.  Dekel is a 45% owner of Diverse Financial.  He has a Series 65 license, and was associated with a California registered investment advisor between August of 2013 and September of 2014.  Dekel held life insurance licenses until March 11, 2014, when they were revoked by the California Insurance Commissioner.  On August 11, 2015, Dekel filed for bankruptcy in the United States Bankruptcy Court for the Central District of California, Case No. SACV 8:15- 13999-TA.

14.     **David Kandell** ("Kandell") resides in Torrance, California and was, until August 2014, the president of Diverse Financial.  Kandell is not registered with the SEC in any capacity.  Kandell is a 45% owner of Diverse Financial.  Kandell held California life insurance licenses until May 22, 2014, when they were revoked by the California Insurance Commissioner.

## OTHER RELEVANT ENTITIES

15.     **DF Capital Partners, LLC** ("DF Capital") is a Delaware limited liability company formed on May 20, 2009.  Its principal place of business is a

4

virtual office located at 8105 Irvine Center Drive, Irvine, California 92618.  It is not registered with the SEC in any capacity.  DF Capital raised at least $3.29 million from at least 16 investors from 2011 through 2013.  Diverse Financial served as DF Capital's managing member.  Dekel founded and had complete control over DF Capital, and was the sole signatory on its bank accounts.  On February 25, 2015, DF Capital filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Central District of California, Case No. SACV 8:15-10922-TA.

16.   **DF Real Estate Partners, LLC** ("DFREP") is a Delaware limited liability company formed on May 2, 2012, and a subsidiary of Diverse Financial. Its principal place of business is a virtual office located at 8105 Irvine Center Drive, Irvine, California 92618.  It is not registered with the SEC in any capacity. DFREP raised money from investors which it purportedly used to purchase, improve, and lease single family residences.  Dekel founded and had complete control over DFREP, and was the sole signatory on its bank accounts. On February 25, 2015, DFREP filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Central District of California, Case No. SACV 8:15-10913-TA.

17.   **DF Insurance Services, Inc.** ("DFIS") is an Arizona corporation formed on February 3, 2013, and a wholly-owned subsidiary of Diverse Financial. Its principal place of business is a virtual office located at 8105 Irvine Center Drive, Irvine, California 92618.  It is not registered with the SEC in any capacity. DFIS was an insurance agency that largely sold life insurance policies and annuities.  Dekel was the director and CEO of DFREP, and was the sole signatory on its bank accounts. On February 25, 2015, DFIS filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Central District of California, Case No. SACV 8:15-10919-TA.

## THE FRAUDULENT SCHEME

18.   From May 2011 until November 2013, Defendants raised

5

approximately $3.29 million from 16 investors by offering and selling the Notes issued by DF Capital.

19.    DF Capital purported to use investor proceeds exclusively to invest in either premium finance lending operations or "short term cash type investments" such as money market accounts.

20.    In premium finance lending, an investor's investment is supposed to be lent to a PFL, which, in turn, would make a loan to an individual purchasing a life insurance policy through an irrevocable life insurance trust.  The individual would use the funds to pay the first year's premium on the policy.  The life insurance company would pay the insured's insurance agent a commission equal to the first year's premium plus an overage averaging 15-20%.  The insurance agent would provide the PFL with an amount equal to the first year's premium plus half of the overage from the commission.  The PFL would then pay off the loan it took from the investor—in this case, an investor in DF Capital— with interest from the commission overage.

21.    DF Capital claimed that when investor funds were not invested with PFLs, the funds would be invested in "cash type investments" such as low risk, low return money market accounts.

22.    In reality, Diverse Financial and Dekel misappropriated 100% of investors' monies, commingled them with Diverse Financial's operating account, and used those monies to fund Diverse Financial's and its affiliates' operations.  Diverse Financial's and its affiliates' expenses included, among other things, employees' salaries (including Dekel's and Kandell's salaries), credit card bills, sponsorship of a Newport Beach jazz festival, and attorneys' fees related to conduct that predated DF Capital.

23.    By at least 2011, Defendants needed investor funds to cover Diverse Financial's increasing losses.  In 2011, the first year DF Capital's Notes were offered, Diverse Financial lost $144,000.  In 2012, Diverse Financial's losses rose

to $430,000.  By the first 11 months of 2013, Diverse Financial's losses were $1.3 million, while its sales had dropped from $1,575,000 in 2012 to only $550,000 for the first 11 months of 2013.

24.    In 2013, Diverse Financial was only able to continue to operate by usurping DF Capital investor funds.   DF Capital made all of its 2013 quarterly interest payments using Diverse Financial funds.  Diverse Financial would have been operating with at least a $1,000,000 deficit absent the DF Capital Notes proceeds.

25.    In December 2013, Diverse Financial's outside accountant informed Diverse Financial and Dekel that the company's $1.3 million in losses for the first 11 months of 2013, as well as prior annual losses for the years 2011 and 2012, were "in effect, financed by investors."

**A.    Solicitation of Investors Based on False Representations**

26.    Defendants solicited investors for the DF Capital Notes in writing and orally.

27.    Sales agents employed by Diverse Financial helped solicit investors. The DF Capital Notes were introduced to Diverse Financial sales agents at a roll-out meeting at Diverse Financial's offices in February 2011, attended by Dekel and Kandell.

28.    Employees of Diverse Financial then introduced the Note program to Diverse Financial life insurance and annuity clients.

29.    Prior to issuing a Note, DF Capital provided investors with:  (1) a DF Capital term sheet ("term sheet"), which investors were required to sign; (2) a DF Capital investment overview (the "investment overview"); and (3) a Note purchase agreement.

30.    The Notes' terms vary from 12 to 36 months, and call for the payment of between 6% and 9% annualized interest, payable quarterly.

31.    The Note purchase agreement stated that the Notes' proceeds would only be used as follows:

The proceeds of the Notes may only be used for the following purposes: (a) investment by [DF Capital] in private premium financing facilities developed by third parties to pay premiums on life insurance policies each with a face value greater than $500,000, and (b) pending investment in such premium financing facilities, investment by [DF Capital] in short term cash type investments.

32.     The term sheet also described the use of proceeds as "short term liquid investments and in a private premium financing facility…developed by third parties to pay premiums on a limited number of large face amount life insurance policies."

33.     The investment overview also described the use of proceeds, explaining that the investor funds would be "deploy[ed] to the credit facility's master escrow account in the name of the premium finance lender."  The investment overview further stated that the "positive arbitrage between the premiums paid and the commissions received, are the source of income to all parties."

34.     Diverse Financial sales agents and Kandell told investors orally that the Notes proceeds would be used exclusively for premium finance lending or cash-type investments.

35.     Thus, according to what Defendants represented orally and in writing, the proceeds from investors who purchased the Notes were to be pooled together to invest in premium finance lending.

36.     These investments were passive investments for the DF Capital Note purchasers, whose returns were expected to come from the efforts of the Defendants. As the Note purchase agreement stated, "investors have no authority to make decisions or exercise investment discretion on behalf of [DF Capital]," and "the

success of the Company depends upon the ability of [Diverse Financial] to make investment decisions that achieve [DF Capital's] investment objective."

**B.     Misappropriation of Investors' Proceeds**

37.     Contrary to their representations to investors that the Notes' proceeds would be used to invest in premium finance lending operations, Diverse Financial and Dekel utilized the Notes proceeds to finance Diverse Financial's operations, such as Dekel's, Kandell's and others' salaries, credit card bills, marketing costs, and unrelated attorneys fees.  Diverse Financial and Dekel also made Ponzi-like payments to certain investors.

38.     Defendants Diverse Financial and Dekel misappropriated 100% of the approximately $3.29 million raised through the DF Capital Notes between May 2011 through November 2013.

39.     Rather than being invested in premium finance lending or, pending such use, into short term cash-type investments, all of the investor funds invested in DF Capital were transferred to Diverse Financial's bank accounts.  While Diverse Financial engaged in a limited amount of premium finance lending, the bank account balances for Diverse Financial and DF Capital are currently $0, while DFREP and DFIS (like DF Capital and Dekel himself) are in bankruptcy.

40.     Defendants' representations concerning the intended use of investors' proceeds were materially false and misleading.  In fact, investors' monies were not exclusively used to invest in premium finance lending.  Instead, Diverse Financial and Dekel used investor proceeds to fund Diverse Financial's and its affiliates' operations and to make Ponzi-like payments to certain investors.

41.     Defendants' misrepresentations concerning the intended use of the proceeds were material.  The diverted investor proceeds were not repaid, and Diverse Financial and its affiliates, as well as Dekel, have filed for bankruptcy protection.

**C.     Ponzi-like Payments**

42.     Between August 1 and December 1, 2013, two DF Capital investors

invested a combined $565,000 with DF Capital.

43.     On January 6, 2014, DF Capital transferred $560,000 of the funds from these two investors to Diverse Financial.

44.     Prior to receiving the two investors' funds from DF Capital, Diverse Financial's bank account balance was $6,800.25.

45.     Eight days after Diverse Financial received the two DF Capital investors' funds, on January 14, 2014, Diverse Financial made a $62,123.85 payment to DF Capital, enabling DF Capital to pay the quarterly interest that was owed to investors on the Notes.

46.     Diverse Financial did not have sufficient cash available to make the interest payment to DF Capital investors without using the DF Capital investor proceeds it received on January 6, 2014.

**D.     Defendants' Scienter and/or Negligence**

47.     Dekel, in addition to owning 45% of and serving as the chief executive officer of Diverse Financial, had sole control over Diverse Financial's, DF Capital's, and their affiliates' bank accounts during the relevant period, and was the sole authorized signatory for these accounts.

48.     Given his control of Diverse Financial's bank accounts, Dekel knew, or was reckless or negligent in not knowing, of the company's operating losses in 2011, 2012 and 2013, and that Diverse Financial could not have continued to operate in 2013 without DF Capital investors' funds.

49.     Dekel approved and facilitated the creation of DF Capital and its offering materials, and encouraged Diverse Financial insurance sales agents to cross-sell investments in DF Capital, including attending the roll-out meeting where DF Capital was presented to Diverse Financial sales agents.  Dekel even offered to pay sales agents $40,000 if they sold $1,200,000 worth of DF Capital Notes in a two month period.

50.     Dekel had final decision-making authority over DF Capital and the

offering materials. Dekel directed the law firm that drafted the Note purchase agreement and reviewed the terms of the Note purchase agreement before it was finalized.

51. Kandell, in addition to owning 45% of and serving as the president of Diverse Financial, managed Diverse Financial sales agents, sold insurance for Diverse Financial, and introduced his clients to the DF Capital Notes as an investment opportunity.

52. Kandell reviewed and approved the DF Capital Notes offering materials, and communicated to the Diverse Financial insurance sales agents he managed that he approved of the statements made in the DF Capital offering materials, attending the roll-out meeting where DF Capital was presented to Diverse Financial sales agents.

53. Kandell introduced multiple investors to DF Capital, provided them with the Note Purchase Agreement, and answered questions they had about the investment. Kandell emailed the Note purchase agreement and Term Sheet to at least one potential investor.

54. Kandell knew or should have known of Diverse Financial's operating losses in 2011, 2012 and 2013, and that Diverse Financial could not have continued to operate in 2013 without DF Capital investors' funds.

55. Kandell also knew or should have known that Dekel and Diverse Financial did not use investor funds as represented. Kandell also knew or should have known that Dekel and Diverse Financial made a Ponzi-like payment to certain investors.

56. As a result, Kandell had no reasonable basis to believe that Diverse Financial used investor proceeds as represented by Kandell orally and in the written offering materials.

57. Because of Dekel's and Kandell's positions as Diverse Financial's senior management, their scienter and/or negligence is attributable to Diverse

Financial.

## FIRST CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendants Diverse Financial and Dekel)

58.    The SEC realleges and incorporates by reference paragraphs 1 through 57 above.

59.    Defendants Diverse Financial and Dekel, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

        (a)    with scienter, employed devices, schemes, or artifices to defraud;

        (b)    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

        (c)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

60.    By engaging in the conduct described above, Defendants Diverse Financial and Dekel violated, and unless restrained and enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendant Kandell)

61.    The SEC realleges and incorporates by reference paragraphs 1

through 57 above.

62. Defendant Kandell, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63. By engaging in the conduct described above, Defendant Kandell violated, and unless restrained and enjoined, will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Diverse Financial and Dekel as primary violators, and,**

**alternatively, against Defendants Diverse Financial and Dekel**

**as control persons of DF Capital)**

64. The SEC realleges and incorporates by reference paragraphs 1 through 57 above.

65. Defendants Diverse Financial and Dekel, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

      (a) employed devices, schemes, or artifices to defraud;

      (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

66.    By engaging in the conduct described above, Defendants Diverse Financial and Dekel violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

67.    Defendants Diverse Financial and Dekel, and each of them, were control persons of DF Capital, because they each possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of DF Capital.  Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), Defendants Diverse Financial and Dekel are liable to the same extent as DF Capital would be for DF Capital's violations of Section 10(b) and Rule 10b-5(b) thereunder.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue orders, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

### **III.**

Order Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## IV.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d) and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  October 28, 2015                    Respectfully Submitted,


                                            /s/ Amy Jane Longo
                                            Amy Jane Longo
                                            Matthew T. Montgomery
                                            Attorneys for Plaintiff
                                            Securities and Exchange Commission

15